UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO

| | |
|---|---|
| MATTHEW LOPEZ, ERIK VELASQUES and FRANK ORTEGA on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>THE PROCTER & GAMBLE COMPANY,<br><br>Defendant. | Case No.<br><br>CLASS ACTION COMPLAINT<br><br>DEMAND FOR JURY TRIAL |

Plaintiffs Matthew Lopez ("Plaintiff Lopez"), Erik Velasquez ("Plaintiff Velasquez") and Frank Ortega ("Plaintiff Ortega") (collectively "Plaintiffs"), bring this action on behalf of themselves and all others similar situated, against The Procter & Gamble Company ("Defendant", "Procter & Gamble" or "P&G"). Plaintiffs make the following allegations based upon (a) personal knowledge, (b) the investigation of counsel, and (c) information and belief.

## **INTRODUCTION**

1.     This class action arises out of P&G's manufacture, distribution, and sale of Old Spice-branded antiperspirant, deodorant, and body sprays (the "Contaminated Sprays") without disclosing that they contain high levels of benzene, a known human carcinogen.

2.     P&G manufactured, distributed, and sold the Contaminated Sprays throughout the United States. On November 3, 2021 pharmaceutical testing laboratory Valisure submitted a Citizen Petition[1] (the "Valisure Petition") to the Food and Drug Administration (the "FDA") requesting the FDA initiate a recall of certain products, included the Old Spice-branded Contaminated Sprays, due to the presence of dangerous amount of the carcinogen benzene.

---

[1] https://www.valisure.com/wp-content/uploads/Valisure-FDA-Citizen-Petition-on-Body-Spray-v4.0-3.pdf

3.      The Valisure Petition contains the results of testing conducted by Valisure which found that many Old Spice sprays contained what Valisure determined to be unsafe levels of benzene. Valisure arrived at this conclusion by comparing the levels of benzene found in the Contaminated Sprays with guidelines established by the FDA for "drug product[s] with a significant therapeutic advance" of 2 parts per million ("ppm"). Valisure found that the Contaminated Sprays often contained benzene well in excess of the 2ppm limit.

4.      Benzene is a known human carcinogen.[2] Benzene is proven to cause cancer in humans, including blood cancers such as leukemia.[3] In addition to cancer, direct exposure of the eyes, skin, or lungs to benzene can cause tissue injury and irritation.[4] Because of these proven effects, the FDA has adopted a limit for benzene in products of 2 parts per million (ppm).[5]

5.      P&G knew or should have known of the dangerous and carcinogenic effects of benzene and should have known that it was producing products that contained benzene. Nevertheless, P&G produced, distributed, and sold Contaminated Sprays that contained benzene.

6.      Plaintiffs are purchasers and users of the Contaminated Sprays. Plaintiffs purchased the Contaminated Sprays to treat conditions the Contaminated Sprays were intended to treat and used the Contaminated Sprays in accordance with the directions provided on their packaging. Plaintiffs did so because they believed the Contaminated Sprays had been manufactured using acceptable standards and practices and that they were safe for human use. In reality, however, the Contaminated Sprays are toxic, dangerous, unmerchantable products unfit

---

[2] National Cancer Institute, Cancer-Causing Substances, Benzene. https://www.cancer.gov/about-cancer/causes-prevention/risk/substances/benzene (last accessed July 19, 2021).
[3] *Id.*
[4] Centers for Disease Control and Prevention, Facts About Benzene, https://emergency.cdc.gov/agent/benzene/basics/facts.asp (last accessed July 19, 2021).
[5] *Id.*

for their intended purpose and use. Plaintiffs and the Class would not have purchased and used the Contaminated Sprays had they know they were unsafe and have, therefore, not received the benefit of their bargain.

7.      Plaintiffs bring this action on behalf of themselves and the Class for equitable relief and to recover damages or equitable relief for: (i) breach of express warranty; (ii) breach of implied warranty; (iii) violation of the consumer protection statutes of the states of which Plaintiffs are citizens; (iv) negligent failure to warn (v) fraudulent concealment; and (vi) unjust enrichment.

## PARTIES

8.      Plaintiff Matthew Lopez is a citizen and resident of Palm Beach County, Florida.

9.      Plaintiff Erik Velasques is a citizen and resident of Los Angeles County, California.

10.      Plaintiff Frank Ortega is a citizen and resident of Los Angeles County, California.

11.      Defendant The Procter & Gamble Company is an Ohio corporation with its principal place of business located in Cincinnati, Ohio.

## JURISDICTION AND VENUE

12.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A), because this is a class action with aggregate claims exceeding $5,000,000.00, exclusive of interest and costs, and the Plaintiffs and most members of the proposed Class are citizens of states different from the Defendant.

13.      The Court has personal jurisdiction over the Defendant P&G. P&G is incorporated in Ohio and maintains its principal place of business in Ohio. P&G is therefore subject to general jurisdiction in Ohio.

14.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(a) because Defendant P&G residents in this District. Venue is also proper in this judicial District pursuant to 28 U.S.C. § 1391(b) and (c) and 18 U.S.C. § 1965, because Defendant P&G transacts business in, is found in, and/or has agents in this District, and because some of the actions giving rise to this complaint took place within this District.

## FACTUAL BACKGROUND

### I.     OLD SPICE SPRAY PRODUCTS

15.     The Old Spice brand was created in the 1930's. Although initially focused on women's fragrances, Old Spice enjoyed early success with its male fragrance line and therefore has traditionally focused on male consumers. P&G purchased the Old Spice fragrances, skin care, deodorant and antiperspirant brands in June 1990.

16.     P&G expanded Old Spice brand offerings to include spray versions of antiperspirants, deodorants, and body sprays in a number of scents. Benzene is not a listed ingredient on the labels of any of the Old Spice-branded Contaminated Sprays manufactured, distributed, or sold by P&G.[6]  The labels of the Old Spice-branded Contaminated Sprays do not warn consumers that the products may contain benzene (or any other carcinogens).

### II.     REGULATION OF OVER-THE-COUNTER DRUG PRODUCTS

17.     Antiperspirants, including those in spray form, are considered over-the-counter drug products subject to regulation by the FDA via the Food, Drug and Cosmetics Act ("FDCA"), 21 U.S.C. § 301 et seq., and corresponding state statutes and regulations.

18.     Drug products are subject to the FDA's Current Good Manufacturing Practice regulations (the "CGMP Regulations"). The CGMP Regulations "contain minimum requirements

---

[6] *See, e.g.*, https://smartlabel.pg.com/00012044045114.html (label information for Old Spice Aluminum Free Body Spray for Men, Swagger, 5.1 Oz).

for the methods, facilities, and controls used in manufacturing, processing, and packing of a drug

product … [these] regulations make sure that a product is safe for use, and that it has the

ingredients and strength it claims to have.[7]

19.     Drug products whose manufacture does not comply with the with CGMP

Regulations are considered "adulterated" or "misbranded" and may not be distributed or sold in

the United States.[8]

20.     A drug product whose manufacture, processing, packing or holding does not

comply with CGMP Regulations is considered "adulterated" or "misbranded.[9] The Federal Food,

Drug, and Cosmetic Act prohibits "the introduction or delivery for introduction into interstate

commerce of any food, drug, device, or cosmetic that is adulterated or misbranded."[10] Because

adulterated and misbranded products may not be sold to consumers or introduced into interstate

commerce in any way, they are effectively worthless.[11]

### III.     BENZENE

21.     Benzene is a colorless, flammable liquid which can occur from natural processes

such as forest fires or volcanoes, or from artificial human manufacturing activities.[12]

22.     Benzene can be absorbed through the skin during contact with a source of

benzene.[13]

---

[7] https://www.fda.gov/drugs/pharmaceutical-quality-resources/current-good-manufacturing-practice-cgmp-regulations
[8] *See* 21 U.S.C. §§ 331(a), 351(a)(2)(B)
[9] The Federal Food, Drug, and Cosmetic Act (FD&C Act) prohibits, among other things, "[t]The introduction or delivery for introduction into interstate commerce of any food, drug, device, or cosmetic that is adulterated or misbranded."⁹21 U.S.C. §§ 331(a); 351(a)(2)(B)
[10] *Id.*
[11] *See* 21 U.S.C. § 331(a).
[12] https://www.cancer.org/cancer/cancer-causes/benzene.html
[13] *Id.*

23.     Benzene is a known human carcinogen, meaning that it is known to cause cancer. Studies have shown that rates of leukemia are higher in humans exposed to high levels of benzene.[14] Studies have also suggested links to the following cancers: (1) childhood leukemia; (2) acute lymphocytic leukemia; (3) chronic lymphocytic leukemia; and (4) other blood-related cancers such as multiple myeloma and non-Hodgkin lymphoma in adults (collectively, "Benzene-caused Cancer(s)").[15]

24.     Lab studies on labs rats and mice have shown that when benzene is inhaled or swallowed it causes different types of tumors to develop.[16] These results support the finding of an excess risk of leukemia in humans.[17]

25.     The United States Department of Health and Human Services (DHHS) has determined that benzene causes cancer in humans.[18] Long-term exposure to high levels of benzene in the air can cause leukemia, cancer of the blood-forming organs.[19]

26.     Similarly, the World Health Organization ("WHO") and the International Agency for Research on Cancer ("IARC") have classified benzene as a Group 1 compound thereby defining it as "carcinogenic to humans."

27.     Benzene's carcinogenic effects are why the FDA classifies benzene as a "Class 1 solvent", meaning that benzene "should not be employed in the manufacture of drug substances, excipients, and drug products because of their unacceptable toxicity ... However, if their use is unavoidable in order to produce a drug product with a significant therapeutic advance, then their

---

[14] *Id.*
[15] *Id.*
[16] *Id.*
[17] *Id.*
[18] https://emergency.cdc.gov/agent/benzene/basics/facts.asp
[19] *Id.*

levels should be restricted" and benzene is restricted under such guidance to 2 parts per million ("ppm").

28.     The National Institute for Occupational Safety and Health ("NIOSH") recommends protective equipment be worn by workers expecting to be exposed to benzene at concentrations of 0.1 ppm and defines "inhalation, skin absorption, ingestion, skin and/or eye contact" as exposure routes.

## SUBSTANTIVE ALLEGATIONS

### IV.     P&G'S OLD SPICE SPRAY PRODUCTS ARE CONTAMINATED WITH BENZENE.

29.     On November 3, 2021, pharmaceutical testing company Valisure filed a Citizens Petition detailing results of Valisure's testing of the several brands' deodorant, antiperspirant, and body sprays, including several types of Old Spice sprays. The Valisure Petition shows that Old Spice spray deodorants, antiperspirants, and body sprays are contaminated with unsafe levels of benzene.

30.     Valisure tested 108 unique batches of body spray products from 30 brands. Valisure found detectable levels of benzene in 59 of those 108 batches. Valisure found average concentrations of benzene over 2.00 ppm in 24 of those batches. Four of those 24 batches were Old Spice sprays.

31.     The fact that no detectable levels of benzene were found in 49 of the 108 batches tested shows that it is not impossible to keep benzene out of these products.

32.     Valisure's test results with concerning Old Spice products can be found in the table below:

| Brand | UPC | Lot | Exp. Date | Type | Description | Avg. level of benzene (ppm) |
|---|---|---|---|---|---|---|
| Old Spice | 012044001912 | 11671458SQ | 6/23 | Antiperspirant | Pure Sport | 17.7 |
| Old Spice | 012044001912 | 11671458SB | 6/23 | Antiperspirant | Pure Sport | 17.4 14.1* |
| Old Spice | 037000695707 | 246144504 | N/A | Deodorant | Below Deck, Powder Spray, Feel Drier & Cleaner, Down Below, Fresh Air | 5.22 6.52* |
| Old Spice | 037000730347 | 11001458SC | 4/23 | Antiperspirant | Sweat Defense, Stronger Swagger, Dry Spray, Sweat & Odor Protection | 4.54 |
| Old Spice | 012044001912 | 12631458SB | 9/23 | Antiperspirant | Pure Sport | 3.34 |

33.     Old Spice products had the two highest levels of benzene detected in any of the 108 batches analyzed by Valisure with two batches of the Old Spice Antiperspirant Pure Sport Spray product testing at 17.7 ppm and 17.4 ppm.

###### A. P&G VIOLATED CGMP REGULATIONS, COMMON LAW, AND STATE CONSUMER PROTECTION STATUTES IN THE MANUFACTURE, PROCESSING, PACKING, AND DISTRIBUTION OF THE CONTAMINATED SPRAYS.

34.     Benzene is not a listed ingredient on the label of any Contaminated Spray, meaning that benzene's presence in the Contaminated Sprays can be attributed to P&G's failings in the manufacturing, processing, and/or packing of the Contaminated Sprays.

35.     Despite P&G's obligations with respect to manufacturing, processing, and packing described above, P&G failed to comply with the CGMP Regulations, or with their common law and state statutory obligations in introducing the Contaminated Sprays into the stream of commerce.

36.     P&G, as the manufacturer, processor, packer, distributor, and seller of the Contaminated Sprays had (and still has) an ongoing duty to ensure the Contaminated Sprays did not contain dangerous levels of benzene.

37.     Had P&G complied with the CGMP Regulations and its duties under state law to observe manufacturing, processing, and packing best practices, benzene would not have made its way into the Contaminated Sprays.

38.     Further, had P&G adopted adequate testing procedures to ensure that products it was introducing into the stream of commerce did not contain dangerous carcinogens such as benzene, it would have discovered that its manufacturing, processing, and/or packing processes were deficient and would have detected benzene in its products and prevented their introduction into the stream of commerce.

39.     P&G's failures described above allowed benzene to be present in the Contaminated Sprays. This means the Contaminated Sprays are "adulterated" as the term is used by the FDCA as they are "drug[s] and the methods used in, or the facilities or controls used for, its manufacture, processing, packing, or holding do not conform to or are not operated or administered in conformity with current good manufacturing practice to assure that such drug meets the requirements of this chapter as to safety and has the identity and strength, and meets the quality and purity characteristics, which it purports or is represented to possess."[20]

40.     The Contaminated Sprays are also "misbranded" as the term is used in the FDCA, because the Contaminated Spray labels do not disclose the presence of benzene, rendering them "false" and "misleading." 21 U.S.C. § 352(a)(1).

---

[20] 21 U.S.C.§ 351(a)(1).

41. As a result of P&G's failure to keep benzene out of the Contaminated Sprays, millions of consumers, including Plaintiffs, have been exposed to dangerous levels of benzene, a known carcinogen, on a daily basis by simply following the directions found on the packaging of the Contaminated Sprays.

**V.     CONSUMERS ARE ENTITLED TO REFUNDS FOR THEIR CONTAMINATED SPRAY PURCAHSES.**

42. Plaintiffs purchased the Contaminated Sprays without knowing or having reason to know that the Contaminated Sprays contained dangerous levels of benzene. Had Plaintiffs known that the Contaminated Sprays contained dangerous levels of benzene, they would not have purchased the Contaminated Sprays at all, or would have paid significantly less for the Contaminated Sprays.

43. Plaintiffs and the Class bargained for deodorant, antiperspirant, and body sprays that conformed with their labels, complied with federal law, and did not contain dangerous levels of carcinogens such as benzene. Plaintiffs were deprived of the benefit of the bargain when they received the Contaminated Sprays which contained dangerous levels of benzene in them.

44. Plaintiffs and the Class are thus entitled to full refunds for the amounts paid for the Contaminated Sprays they purchased on the basis that they have been deprived of the benefit of their bargain.

**VI.     CONSUMERS REQUIRE MEDICAL MONITORING.**

**i.   PLAINTIFFS AND CLASS MEMBERS HAVE INCREASED RISK OF CONTRACTING BENZENE-CAUSED CANCER BECAUSE THE CONTAMINATED SPRAYS THEY REGULARLY USED EXPOSED THEM TO UNSAFE LEVEL OF BENZENE.**

45. As alleged below, each Plaintiffs regularly used the Contaminated Sprays as directed on the Contaminated Sprays' labels.

46.     Plaintiffs used Contaminated Sprays manufactured and distributed by P&G as directed by the Contaminated Sprays' labels.  These products, unbeknownst to Plaintiffs, contained benzene, a known carcinogen.

47.     Based on prevailing scientific evidence, and the classifications adopted by numerous agencies, regulatory bodies, and scientific organizations discussed *supra*, exposure to benzene via skin absorption can cause cancer, including leukemia and other blood-related cancers.

48.     Thus, as a direct and proximate result of using P&G's Contaminated Sprays for years, Plaintiffs are at a significantly increased risk of contracting Benzene-caused Cancers. Plaintiffs' lengthy duration of exposure to benzene from P&G's Contaminated Sprays warrants additional medical testing not routinely provided to the public at large.

### ii. PLAINTIFFS AND THE CLASS MEMBERS REQUIRE DIAGNOSTIC MEDICAL TESTING THAT DIFFERS FROM ROUTINE MEDICAL CARE.

49.     Physicians evaluate a person's exposure to toxic and carcinogenic substances, including benzene, when determining what diagnostic testing and treatment is necessary.

50.     A reasonably prudent person would conclude that Plaintiffs' repeated exposure to significant, unsafe levels of benzene over lengthy periods of time necessitates specialized testing (with resultant treatments) that is not generally given to the public at large as a part of routine medical care.

51.     The available monitoring regime, discussed in greater detail below, is reasonably necessary and specific for individuals exposed to products known to significantly increase the risk of the Benzene-Caused Cancers because of exposure to benzene. It is different from that

normally recommended in the absence of exposure to this risk of harm (whether in kind and/or frequency) and is not generally available in a general practitioner setting.

52.     The available medical monitoring regime will mitigate the development of and health effects associated with the Benzene-Caused Cancers, improving prognosis, outcome, and quality of life, and reducing medical costs.

53.     Consistent with best practices, Plaintiffs seek to implement a medical monitoring program which begins with screening to determine whether more invasive or costly tests are warranted. This screening may be conducted via questionnaire, in-person before a medical practitioner, or via a tele-health appointment.

54.     Medical practitioners will review the questionnaire or the results of a screening appointment to determine whether additional testing, such as a blood test, for purposes of diagnosis is required. Leukemia and other Benzene-Caused Cancers are typically found via blood tests and can be detected before symptoms begin.[21]

55.     Additional testing may include blood tests and/or bone marrow tests.[22] Blood tests allow doctors to determine whether an individual has abnormal levels of red or white blood cells or platelets, which may suggest leukemia, or can show the presence of leukemia cells.[23] Bone marrow tests are used to determine whether leukemia cells which can avoid detection in blood tests are present.[24]

56.     Screening and testing in the medical monitoring program will likely occur for an extended period of time. This permits the medical practitioners to monitor changes in symptoms

---

[21] https://www.mayoclinic.org/diseases-conditions/leukemia/diagnosis-treatment/drc-20374378
[22] *Id.*
[23] *Id.*
[24] *Id.*

or follow anomalies that may appear in tests over time, and accommodates latency periods associated with the Benzene-Caused Cancers.

## VII. PLAINTIFF ALLEGATIONS

### A. PLAINTIFF MATTHEW LOPEZ

57.     Plaintiff Matthew Lopez is a citizen and resident of Palm Beach County, Florida

58.     Plaintiff Lopez purchased and used Contaminated Sprays during the Class Period, including Old Spice Deodorant Sprays and Old Spice Body Sprays in the following scents: Swagger, Champion, Reef.

59.     Plaintiff Lopez used each Contaminated Spray he purchased as directed by the Contaminated Spray product labels.

60.     Plaintiff Lopez would not have purchased or used any Contaminated Sprays had he known that the Contaminated Sprays were at risk of, or did in fact, contain benzene.

61.     Plaintiff Lopez was deprived of the benefit of the bargain when he purchased Contaminated Sprays without knowing the Contaminated Sprays were at risk of containing, or did in fact contain, benzene.

62.     Plaintiff Lopez requires medical monitoring to ensure that if he develops any Benzene-caused Cancers or other health conditions because of his use of Contaminated Sprays the conditions are detected early to give him the best possible chance of having the condition resolve or be treated successfully.

### B. PLAINTIFF ERIK VELASQUES

63.     Plaintiff Erik Velasques is a citizen and resident of Los Angeles County, California.

64. Plaintiff Velasques purchased and used Contaminated Sprays during the Class Period, including Old Spice Deodorant Sprays, Old Spice Antiperspirant Sprays, and Old Spice Body Sprays in the Capitán scent.

65. Plaintiff Velasques used each Contaminated Spray he purchased as directed by the Contaminated Spray product labels.

66. Plaintiff Velasques would not have purchased or used any Contaminated Sprays had he known that the Contaminated Sprays were at risk of, or did in fact, contain benzene.

67. Plaintiff Velasques was deprived of the benefit of the bargain when he purchased Contaminated Sprays without knowing the Contaminated Sprays were at risk of containing, or did in fact contain, benzene.

68. Plaintiff Velasques requires medical monitoring to ensure that if he develops any Benzene-caused Cancers or other health conditions because of his use of Contaminated Sprays the conditions are detected early to give him the best possible chance of having the condition resolve or be treated successfully.

**C. PLAINTIFF FRANK ORTEGA**

69. Plaintiff Frank Ortega is a citizen and resident of Los Angeles County, California.

70. Plaintiff Ortega purchased and used Contaminated Sprays during the Class Period, including Old Spice Deodorant Sprays and Old Spice Body Sprays in the Pure Sport scent.

71. Plaintiff Ortega used each Contaminated Spray he purchased as directed by the Contaminated Spray product labels.

72. Plaintiff Ortega would not have purchased or used any Contaminated Sprays had he known that the Contaminated Sprays were at risk of, or did in fact, contain benzene.

73.     Plaintiff Ortega was deprived of the benefit of the bargain when he purchased Contaminated Sprays without knowing the Contaminated Sprays were at risk of containing, or did in fact contain, benzene.

74.     Plaintiff Ortega requires medical monitoring to ensure that if he develops any Benzene-caused Cancers or other health conditions because of his use of Contaminated Sprays the conditions are detected early to give him the best possible chance of having the condition resolve or be treated successfully.

**VIII.   CLASS ALLEGATIONS**

75.     Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b).

A.     **CLASSSES AND SUBCLASSES**

76.     Plaintiffs seek certification of the following Classes and Subclasses:

i.     **ECONOMIC LOSS CLASS AND SUBCLASSES**

77.     Plaintiffs seek class certification on behalf of a class defined as follows (the "Economic Loss Class"):

**ECONOMIC LOSS CLASS:** All individuals who, from the beginning of any applicable limitations period through the present, purchased a Contaminated Spray in the United States.

78.     Plaintiffs seek certification on behalf of a subclass defined as follows:

**CALIFORNIA ECONOMIC LOSS SUBCLASS:** All individuals who were or are citizens of the State of California who, from the beginning of any applicable limitations period through the present, purchased a Contaminated Spray during the Class Period (the "California Economic Loss Subclass").

79.     Plaintiffs seek certification on behalf of a subclass defined as follows:

**FLORIDA ECONOMIC LOSS SUBCLASS:** All individuals who were or are citizens of the State of Florida who, from the beginning of any applicable limitations period

through the present, purchased a Contaminated Spray (the "Florida Economic Loss Subclass").

80.     Plaintiffs reserve the right to modify or refine the definitions of the Economic Loss Class or Economic Loss Subclasses based upon discovery of new information and in order to accommodate any of the Court's manageability concerns.

### i. MEDICAL MONITORING CLASSES AND SUBCLASSES

81.     Plaintiffs seek class certification on behalf of a class defined as follows (the "Medical Monitoring Class"):

**MEDICAL MONITORING CLASS**: All individuals who, from the beginning of any applicable limitations period through the present, purchased and used Contaminated Sprays in the United States and have not been diagnosed with a Benzene-caused Cancer or other health condition:

82.     Plaintiffs seek certification on behalf of a subclass defined as follows:

**CALIFORNIA MEDICAL MONITORING SUBCLASS**: All individuals who were or are citizens of the State of California who, from the beginning of any applicable limitations period through the present, purchased and used a Contaminated Spray and have not been diagnosed with a Benzene-caused Cancer or other health condition (the "California Medical Monitoring Subclass")

83.     Plaintiffs seek certification on behalf of a subclass defined as follows:

**FLORIDA MEDICAL MONITORING SUBCLASS**: All individuals who were or are citizens of the State of Florida who, from the beginning of any applicable limitations period through the present, purchased and used a Contaminated Spray and have not been diagnosed with a Benzene-caused Cancer or other health condition (the "Florida Medical Monitoring Subclass" and with the California Medical Monitoring Subclass, the "Medical Monitoring Subclasses").

84.     Plaintiffs reserve the right to modify or refine the definitions of the Medical Monitoring Class or the Medical Monitoring Subclasses based upon discovery of new information and in order to accommodate any of the Court's manageability concerns.

## B. FED. R. CIV. P. 23 REQUIREMENTS

85. **Ascertainability**. The proposed Classes and Subclasses are readily ascertainable because they are defined using objective criteria so as to allow class members to determine if they are part of a Class or Subclass. Further, the Classes and Subclasses can be readily identified through records maintained by P&G.

86. **Numerosity (Rule 23(a)(1))**. The Classes and Subclasses are so numerous that joinder of individual members herein is impracticable. The exact number of members of the Class and Subclasses, as herein identified and described, is not known, upon information and belief there are millions of individuals who purchased the Contaminated Sprays.

87. **Commonality (Rule 23(a)(2))**. Common questions of fact and law exist for each cause of action and predominate over questions affecting only individual Class and Subclass members, including the following:

(a) whether the Contaminated Sprays contain, or are likely to contain, or exposed the Classes and Subclasses to unacceptable levels of benzene;

(b) whether exposure to and consumption of Benzene increases the risk of developing any of the Benzene-caused Cancers;

(c) whether P&G knew or should have known that the Contaminated Sprays contained, or were likely to contain, unacceptable levels of benzene;

(d) whether P&G knew or should have known that use of the Contaminated Sprays increased the risk of developing any of the Benzene-caused Cancers;

(e) whether P&G acted to conceal the fact that the Contaminated Sprays expose users to unacceptable amounts of benzene;

(f) whether P&G acted to conceal the fact that use of the Contaminated Sprays increased the risk of developing cancer;

(g) whether P&G was negligent in labeling, marketing, advertising, promoting and/or manufacturing and/or selling the Contaminated Sprays;

(h)     whether P&G is liable for failing to warn of the risks associated with use of the Contaminated Sprays;

(i)     whether Plaintiffs, members of the Medical Monitoring Class, and members of the Medical Monitoring Subclasses are entitled to medical monitoring relief as a result of their increased risk of developing the Benzene-Caused Cancers based on use of the Contaminated Sprays; and

(j)     the type and format of medical monitoring relief, declaratory relief and/or injunctive relief that is appropriate.

88.     **Typicality (Rule 23(a)(3))**. Plaintiffs' claims are typical of the claims of the proposed Classes and Subclasses. Plaintiffs and the Classes and Subclasses (as applicable) suffered injuries as a result of P&G's wrongful conduct that is uniform across the Classes and Subclasses.

89.     **Adequacy (Rule 23(a)(4))**. Plaintiffs have and will continue to fairly and adequately represent and protect the interests of the Classes and Subclasses. Plaintiffs have retained counsel competent and experienced in complex litigation and class actions. Plaintiffs have no interest that is antagonistic to those of the Classes and Subclasses, and P&G have no defenses unique to Plaintiffs. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the members of the Classes and Subclasses, and they have the resources to do so. Neither Plaintiffs nor Plaintiffs' counsel have any interest adverse to those of the other members of the Classes and Subclasses.

90.     **Substantial Benefits**. This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy and joinder of all members of the Classes and Subclasses is impracticable. The prosecution of separate actions by individual members of the Classes and Subclasses would impose heavy burdens upon the Courts and P&G, would create a risk of inconsistent or varying adjudications of the questions of law and fact common to members of the Classes and

Subclasses, and would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests. This proposed class action presents fewer management difficulties than individual litigation, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. Class treatment will create economies of time, effort, and expense and promote uniform decision-making.

91.     Class certification, therefore, is appropriate under Fed. R. Civ. P. 23(b)(3) because the above common questions of law or fact predominate over any questions affecting individual members of the Class, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

92.     Class certification is also appropriate under Fed. R. Civ. P. 23(b)(2) because P&G acted or refused to act on grounds generally applicable to the Classes and Subclasses, so that final injunctive relief or corresponding declaratory relief is appropriate as to the Class and Subclasses as a whole.

93.     Plaintiffs reserve the right to revise the foregoing class allegations and definitions based on facts learned and legal developments following additional investigation, discovery, or otherwise.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

**BREACH OF EXPRESS WARRANTY**
**On Behalf of the Economic Loss Class or, alternatively, the Economic Loss Subclasses**

94.     Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

95.     P&G manufactured, distributed, and sold the Contaminated Sprays into the stream of commerce with the intent that the Contaminated Sprays would be purchased by Plaintiffs and the Economic Loss Class and Economic Loss Subclasses.

96.     P&G expressly warranted, advertised, and represented to Plaintiffs and the Economic Loss Class and Economic Loss Subclasses that the Contaminated Sprays were safe and appropriate for human use.

97.     P&G made these express warranties regarding the Contaminated Sprays quality and fitness for use in writing through its website, advertisements, and marketing materials and on the Contaminated Sprays' packaging and labels. These express warranties became part of the basis of the bargain that Plaintiffs and the Class and Subclasses entered into upon purchasing the Contaminated Sprays.

98.     P&G's advertisements, warranties, and representations were made in connection with the sale of the Contaminated Sprays to Plaintiffs, the Economic Loss Class, and the Economic Loss Subclasses.  Plaintiffs, the Economic Loss Class, and Economic Loss Subclasses relied on P&G's advertisements, warranties, and representations regarding the Contaminated Sprays in deciding whether to purchase P&G's products.

99.     P&G's Contaminated Sprays do not conform to P&G's advertisements, warranties and representations in that they are not safe, healthy, and appropriate for human use.

100.     P&G therefore breached its express warranties by placing Contaminated Sprays into the stream of commerce and selling them to consumers, when their use had dangerous effects and was unsafe, rendering these products unfit for their intended use and purpose, and unsafe and unsuitable for consumer use as marketed by P&G. These associated health effects substantially impair the use, value, and safety of Contaminated Sprays.

101. P&G was aware, or should have been aware, of the presence of the human carcinogen benzene in the Contaminated Sprays and therefore was aware or should have been aware of the toxic or dangerous health effects of the use of the Contaminated Sprays, but nowhere on the package labeling or on P&G's websites or other marketing materials did P&G warn Plaintiffs and members of the Economic Loss Class and Economic Loss Subclasses and the presence of benzene in the Contaminated Sprays or the dangers it posed.

102. Instead, P&G concealed the presence of benzene in the Contaminated Sprays and deceptively represented that the Contaminated Sprays were safe, healthy, and appropriate for human use. P&G thus utterly failed to ensure that the material representations it was making to consumers were true.

103. Benzene was present in the Contaminated Sprays when they left P&G's possession or control and were sold to Plaintiffs, members of the Economic Loss Class and Economic Loss Subclasses. The dangers associated with use of the Contaminated Sprays were undiscoverable by Plaintiffs, members of the Economic Loss Class and Economic Loss Subclasses at the time of purchase of the Contaminated Sprays.

104. As manufacturers, marketers, advertisers, distributors, and sellers of Contaminated Sprays, P&G had exclusive knowledge and notice of the fact that the Contaminated Sprays did not conform to the affirmations of fact and promises.

105. In addition, or in the alternative, to the formation of an express contract, P&G made each of the above-described representations to induce Plaintiffs and members of the Economic Loss Class and Economic Loss Subclasses to rely on such representations.

106. P&G's affirmations of fact and promises were material, and Plaintiffs and members of the Economic Loss Class and Economic Loss Subclasses reasonably relied upon such representations in purchasing the Contaminated Sprays.

107. All conditions precedent to P&G's liability for its breach of express warranty have been performed by Plaintiffs or members of the Economic Loss Class or Economic Loss Subclasses.

108. Affording P&G an opportunity to cure its breaches of written warranties would be unnecessary and futile here. P&G had ample opportunity to test its products for benzene and to modify their manufacturing processes to ensure benzene was not present in the Contaminated Sprays to make them safe and healthy for use by Plaintiffs and members of the Economic Loss Class and Subclasses, or recall them, but failed to do so until now.

109. As a direct and proximate result of P&G's breaches of express warranty, Plaintiffs and members of the Classes and Subclasses have been damaged because they did not receive the products as specifically warranted by P&G. Plaintiffs and members of the Economic Loss Class and Economic Loss Subclasses did not receive the benefit of the bargain and suffered damages at the point of sale stemming from their overpayment for the Contaminated Sprays.

110. Plaintiffs and the Economic Loss Class and Economic Loss Subclasses seek actual damages, injunctive and declaratory relief, attorneys' fees, costs, and any other just and proper relief available thereunder for P&G's failure to deliver goods conforming to their express warranties and resulting breach.

## SECOND CLAIM FOR RELIEF

### BREACH OF IMPLIED WARRANTY
**On Behalf of the Economic Loss Class or, alternatively, the Economic Loss Subclasses**

111. Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

112.    P&G is a merchant engaged in the sale of goods to Plaintiffs and the Economic Loss Class and Economic Loss Subclasses.

113.    There was a sale of goods from P&G to Plaintiffs and the Economic Loss Class and Economic Loss Subclasses.

114.    At all times mentioned herein, P&G manufactured, distributed, or supplied Contaminated Sprays, and prior to the time the Contaminated Sprays were purchased by Plaintiffs and the Economic Loss Class and Economic Loss Subclasses, P&G impliedly warranted to them that the Contaminated Sprays were of merchantable quality, fit for their ordinary use, and conformed to the promises and affirmations of fact made on the Contaminated Sprays' labels and packaging, including that the Contaminated Sprays were safe and appropriate for human use. Plaintiffs and the Economic Loss Class and Economic Loss Subclasses relied on P&G's promises and affirmations of fact when they purchased the Contaminated Sprays.

115.    Contrary to these representations and warranties, the Contaminated Sprays were not fit for their ordinary use, and did not conform to P&G's affirmations of fact and promises as use of the Contaminated Sprays was accompanied by the risk of exposure to benzene and to developing Benzene-caused Cancers which does not conform to the packaging.

116.    P&G breached its implied warranties by selling Contaminated Sprays that failed to conform to the promises or affirmations of fact made on the packaging or label as use of each Contaminated Sprays was accompanied by the risk of exposure to benzene and to developing Benzene-caused Cancers which does not conform to the packaging.

117.    P&G was, or should have been on notice of this breach, as it was on notice that the process used to manufacture the Contaminated Sprays was likely to result in the presence of benzene in the Contaminated Sprays.

118.     Privity exists because P&G impliedly warranted to Plaintiffs and the Economic Loss Class and Economic Loss Subclasses through the warranting, packaging, advertising, marketing, and labeling that Contaminated Sprays were natural, and suitable for use to treat health conditions by individuals, and made no mention of the attendant health risks associated with use of the Contaminated Sprays.

119.     As a direct and proximate result of P&G's conduct, Plaintiffs, the Economic Loss Class, and the Economic Loss Subclasses have suffered actual damages in that each Contaminated Spray they purchased is worth less than the price they paid and that they would not have purchased at all had they known of the attendant health risks associated with the use of each Contaminated Spray.

120.     Plaintiffs, the Economic Loss Class, and the Economic Loss Subclasses seek actual damages, injunctive and declaratory relief, attorneys' fees, costs, and any other just and proper relief available thereunder for P&G's failure to deliver goods conforming to their implied warranties and resulting breach.

## <u>THIRD CLAIM FOR RELIEF</u>

### FRAUDULENT MISREPRESENTATION
**On Behalf of the Economic Loss Class or, alternatively, the Economic Loss Subclasses**

121.     Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

122.     P&G falsely represented to Plaintiffs, the Economic Loss Class, and the Economic Loss Subclasses that the Contaminated Sprays did not contain unsafe levels of carcinogens and were safe for human use.

123.     P&G intentionally, knowingly, and recklessly made these misrepresentations to induce Plaintiffs, the Economic Loss Class, and the Economic Loss Subclasses to purchase Contaminated Sprays.

124. For at least part of the Class Period, P&G knew that its representations about the Contaminated Sprays were false, or that there was a significantly likelihood that they were false, in that the Contaminated Sprays either did contain, or had a significant risk of containing unsafe amounts of the carcinogen benzene which does not conform to the products' labels, packaging, advertising, and statements. P&G knowingly allowed its packaging, labels, advertisements, promotional materials, and websites to intentionally mislead consumers, such as Plaintiffs, the Economic Loss Class, and the Economic Loss Subclasses.

125. Plaintiffs, the Economic Loss Class, and the Economic Loss Subclasses did in fact rely on these misrepresentations and purchased Contaminated Sprays to their detriment. Given the deceptive manner in which P&G advertised, represented, and otherwise promoted the Contaminated Sprays, the reliance Plaintiffs, the Economic Loss Class, and the Economic Loss Subclasses placed on P&G's misrepresentations was justifiable.

126. As a direct and proximate result of P&G's conduct, Plaintiffs, the Economic Loss Class, and the Economic Loss Subclasses have suffered actual damages in that they purchased Contaminated Sprays that were worth less than the price they paid and that they would not have purchased at all had they known of the risk of the presence of unsafe levels of benzene in the Contaminated Sprays and the health risks, including cancer, associated with the use of the Contaminated Sprays that does not conform with the Contaminated Sprays' labels, packaging, advertising, and statements.

127. Plaintiffs, the Economic Loss Class, and the Economic Loss Subclasses seek actual damages, injunctive and declaratory relief, attorneys' fees, costs, and any other just and proper relief available under the laws.

## FOURTH CLAIM FOR RELIEF

### FRAUD BY OMISSION
**On Behalf of the Economic Loss Class or, alternatively, the Economic Loss Subclasses**

128.     Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

129.     P&G concealed from and failed to disclose to Plaintiffs, the Economic Loss Class, and the Economic Loss Subclasses that use of Contaminated Sprays is accompanied by a risk of exposure to the carcinogen benzene which carries with it the risk of developing Benzene-caused Cancers which does not conform to the products' labels, packaging, advertising, and statements.

130.     P&G was under a duty to disclose to Plaintiffs, the Economic Loss Class, and the Economic Loss Subclasses the true safety, quality, characteristics, fitness for use, and suitability of the Contaminated Sprays because: (1) P&G was in a superior position to know the true state of facts about its products; (2) P&G was in a superior position to know the risks associated with the use of, characteristics of, and suitability of Contaminated Sprays for use by individuals; and (3) P&G knew that Plaintiffs, the Economic Loss Class, and the Economic Loss Subclasses could not reasonably have been expected to learn or discover that Contaminated Sprays were misrepresented in the packaging, labels, advertising, and websites prior to purchasing Contaminated Sprays.

131.     The facts concealed or not disclosed by P&G to Plaintiffs, the Economic Loss Class, and the Economic Loss Subclasses were material in that a reasonable consumer would have considered them important when deciding whether to purchase Contaminated Sprays.

132.     Plaintiffs and the Class and Subclasses justifiably relied on the P&G's omissions to their detriment.  The detriment is evident from the true quality, characteristics, and risk associated with the use of Contaminated Sprays, which is inferior when compared to how Contaminated Sprays are advertised and represented by P&G.

133.    As a direct and proximate result of P&G's conduct, Plaintiffs, the Economic Loss Class, and the Economic Loss Subclasses have suffered actual damages in that they purchased Contaminated Sprays that were worth less than the price they paid and that they would not have purchased at all had they known of the health risks associated with the use of the Contaminated Sprays which do not conform to the Contaminated Sprays' labels, packaging, advertising, and statements.

134.    Plaintiffs, the Economic Loss Class, and the Economic Loss Subclasses seek actual damages, injunctive and declaratory relief, attorneys' fees, costs, and any other just and proper relief available under the laws.

## FIFTH CLAIM FOR RELIEF

### NEGLIGENT MISREPRESENTATION
**On Behalf of the Economic Loss Class or, alternatively, the Economic Loss Subclasses**

135.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

136.    P&G had a duty to Plaintiffs, the Economic Loss Class, and the Economic Loss Subclasses to exercise reasonable and ordinary care in the developing, testing, manufacture, marketing, distribution, and sale of Contaminated Sprays.

137.    P&G breached its duty to Plaintiffs, the Economic Loss Class, and the Economic Loss Subclasses by developing, testing, manufacturing, advertising, marketing, distributing, and selling products to Plaintiffs, the Economic Loss Class, and the Economic Loss Subclasses that did not have the qualities, characteristics, and suitability for use as advertised by P&G and by failing to promptly remove Contaminated Sprays from the marketplace or to take other appropriate remedial action upon becoming aware of the health risks of the Contaminated Sprays.

138.    P&G knew or should have known that the qualities and characteristics of the Contaminated Sprays were not as advertised or suitable for their intended use and were otherwise

not as warranted and represented by P&G, yet continued selling the Contaminated Sprays. Specifically, P&G knew or should have known that: (1) the manufacturing process used to produce the Contaminated Sprays resulted in the presence of benzene in the Contaminated Sprays or a substantial risk that benzene would be found in the Contaminated Sprays and (2) the Contaminated Sprays were otherwise not as warranted and represented by P&G.

139.    As a direct and proximate result of P&G's conduct, Plaintiffs, the Economic Loss Class, and the Economic Loss Subclasses have suffered actual damages in that they purchased Contaminated Sprays that were worth less than the price they paid and that they would not have purchased at all had they known they contained the carcinogen benzene that is known to cause the Benzene-caused cancers which does not conform to the products' labels, packaging, advertising, and statements.

140.    Plaintiffs, the Economic Loss Class, and the Economic Loss Subclasses seek actual damages, injunctive and declaratory relief, attorneys' fees, costs, and any other just and proper relief available.

## SIXTH CLAIM FOR RELIEF

### UNJUST ENRICHMENT
**On Behalf of the Economic Loss Class or, alternatively, the Economic Loss Subclasses**

141.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

142.    Plaintiffs, the Economic Loss Class, and the Economic Loss Subclasses conferred substantial benefits on P&G through their purchase and use of Contaminated Sprays. P&G knowingly and willingly accepted and enjoyed these benefits.

143.    P&G either knew or should have known that the payments rendered by Plaintiffs, the Economic Loss Class, and the Economic Loss Subclasses were given with the expectation that the Contaminated Sprays would have the qualities, characteristics, and suitability for use

represented and warranted by P&G. As such, it would be inequitable for P&G to retain the benefit of the payments under these circumstances.

144.    P&G's acceptance and retention of these benefits under the circumstances alleged herein make it inequitable for P&G to retain the benefits without payment of the value to Plaintiffs, the Economic Loss Class, and the Economic Loss Subclasses.

145.    Plaintiffs, the Economic Loss Class, and the Economic Loss Subclasses are entitled to recover from P&G all amounts wrongfully collected and improperly retained by P&G, plus interest thereon.

146.    Plaintiffs, the Economic Loss Class, and the Economic Loss Subclasses seek actual damages, injunctive and declaratory relief, attorneys' fees, costs, and any other just and proper relief available under the laws.

## **SEVENTH CLAIM FOR RELIEF**

**NEGLIGENT FAILURE TO WARN**
**On Behalf of the Medical Monitoring Class or, alternatively,**
**the Medical Monitoring Subclasses**

147.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

148.    Under the laws of California, Delaware, Indiana, Massachusetts, Missouri, and South Carolina, manufacturers, including P&G, have a duty of reasonable care to warn of particular risks that are known or knowable in light of the generally recognized and prevailing scientific and medical knowledge available at the time of manufacture and distribution. P&G breached this duty for its Contaminated Sprays. The warnings included on were inadequate because they did not warn of the presence of benzene in the Contaminated Sprays, of the substantial risk that benzene was in the Contaminated Sprays, or of the fact that exposure to benzene can result in the development of the Benzene-caused Cancers.

149.    Plaintiffs, the Medical Monitoring Class, and the Medical Monitoring Subclasses or their doctors would have read and heeded these warnings had they been included on the labels and packaging of the Contaminated Sprays. Had such warnings been provided, Plaintiffs, the Medical Monitoring Class, and the Medical Monitoring Subclasses would have been made aware of the risks of developing the Beneze-caused Cancers associated with exposure to the carcinogen benzene found in the Contaminated Sprays.

150.    As a direct and proximate result of P&G's failure to provide adequate warnings of the risk of exposure to benzene and the risk of development of Benzene-caused Cancers through exposure to benzene, Plaintiffs, the Medical Monitoring Class, and the Medical Monitoring Subclasses have sustained a significantly increased risk of developing serious and potentially fatal Benzene-caused Cancers and have suffered and will suffer economic losses and expenses associated with ongoing medical monitoring.

151.    The latent injuries from which Plaintiffs, the Medical Monitoring Class, and the Medical Monitoring Subclasses suffer require specialized testing (with resultant treatment) that is not generally given to the public at large. The available monitoring regime is specific for individuals exposed to products known to significantly increase the risk of the Benzene-caused Cancers of using Contaminated Sprays and is different from that normally recommended in the absence of exposure to this risk of harm.

152.    The medical monitoring regime should include, but is not limited to, baseline tests and diagnostic examination that will assist in early detection and diagnosing the Benzene-caused Cancers. This diagnostic program will facilitate treatment and interventions that will mitigate the development of, and health effects associated with, the Benzene-caused Cancers.

153. The available monitoring regime is reasonably necessary according to contemporary scientific principles within the medical community specializing in the diagnosis and treatment of the Benzene-caused Cancers.

154. By monitoring and testing Plaintiffs, the Medical Monitoring Class, and the Medical Monitoring Subclasses, the risk of developing and losses arising from suffering from long-term injuries, disease will be significantly reduced.

155. Plaintiffs, the Medical Monitoring Class, and the Medical Monitoring Subclasses seek creation of a Court-supervised, P&G-funded medical monitoring program which will facilitate the diagnoses of Plaintiffs, the Medical Monitoring Class, and the Medical Monitoring Subclasses for the Benzene-caused Cancers. The medical monitoring should include a trust fund to pay for the medical monitoring and diagnosis of Plaintiffs, the Medical Monitoring Class, and the Medical Monitoring Subclasses as frequently and appropriately as necessary.

156. Accordingly, P&G should be required to establish a medical monitoring program that includes, among other things: (a) establishing a trust fund, in an amount to be determined, to pay for the medical monitoring of everyone who has used the Contaminated Sprays for the purpose of diagnosis, as frequently and appropriately as necessary; and (b) notifying all members of the Medical Monitoring Class and the Medical Monitoring Subclasses in writing that they may require frequent medical monitoring for the purpose of diagnosis.

157. Plaintiffs, the Medical Monitoring Class, and the Medical Monitoring Subclasses have an inadequate remedy at law in that monetary damages alone cannot compensate them for the risk of long-term physical and economic losses due to using the Contaminated Sprays tainted with the carcinogen benzene. Without a court-approved medical monitoring program as described herein, or established by the Court, Plaintiffs, the Medical Monitoring Class, the State

Medical Monitoring Subclasses will continue to face an unreasonable risk of injury and disability and remain undiagnosed.

## EIGHTH CLAIM FOR RELIEF

**CALIFORNIA'S CONSUMER LEGAL REMEDIES ACT**
**Cal. Civ. Code §§ 1750 *et seq*.**
**On Behalf of Plaintiff Velasques, Plaintiff Ortega,**
**and the California Economic Loss Subclass**

158.    Plaintiffs incorporate the forgoing allegations as if fully set forth herein.

159.    Plaintiff Velasques, Plaintiff Ortega, and the California Economic Loss Subclass have provided P&G, via certified mail, return receipt requested, notice of the specific complaint and damages in accordance with Cal. Civ. Code § 1761. Subject to the response, if any, by P&G within 30 days of the notice, Plaintiffs, on behalf of themselves and the Classes, shall amend the Complaint to include this Claim for Relief and demand all appropriate relief under the CLRA.

160.    Plaintiff Velasques, Plaintiff Ortega, and the California Economic Loss Subclass are "consumer[s]" as that term is defined in Cal. Civ. Code § 1761(d).

161.    The Contaminated Sprays are "goods," as that term is defined in Cal. Civ. Code § 1761(a).

162.    P&G is a "person" as that term is defined in Cal. Civ. Code § 1761(c).

163.    Each purchase of a Contaminated Spray by Plaintiff Velasques, Plaintiff Ortega, and the California Economic Loss Subclass constituted a "transaction" as that term is defined in Cal. Civ. Code § 1761(e).

164.    P&G's conduct alleged herein violates the following provisions of California's Consumer Legal Remedies Act (the "CLRA"):

      A. Cal. Civ. Code § 1770(a)(5), by negligently, recklessly, and/or intentionally representing that the Contaminated Sprays were and are safe for use by individuals when in fact they contain an unsafe chemical,

benzene, which could cause a Contaminated Spray user to develop
Benzene-caused cancers.

B.  Cal. Civ. Code § 1770(a)(7), by negligently, recklessly, and/or
    intentionally representing that the Contaminated Sprays were of a
    particular standard, quality, or grade, when they were of another;

C.  Cal. Civ. Code § 1770(a)(9), by negligently, recklessly, and/or
    intentionally advertising the Contaminated Sprays with intent not to sell
    them as advertised; and

D.  Cal. Civ. Code § 1770(a)(16), by representing that the Contaminated
    Sprays have been supplied in accordance with previous representations
    when they have not.

165.    As a direct and proximate result of these violations, Plaintiff Velasques, Plaintiff

Ortega, and the California Economic Loss Subclass have been harmed by the misleading

marketing described herein in any manner in connection with the advertising and sale of the

Contaminated Sprays.

166.    Plaintiff Velasques, Plaintiff Ortega, and the California Economic Loss Subclass

seek relief for the injuries they have suffered as a result of P&G's practices, as provided by the

CLRA and applicable law.

## NINTH CLAIM FOR RELIEF

**CALIFORNIA'S FALSE ADVERTISING LAW**
**Cal. Bus. & Prof. Code §§ 17500 *et seq*.**
**On Behalf of Plaintiff Velasques, Plaintiff Ortega,**
**and the California Economic Loss Subclass**

167.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

168.    California's False Advertising Law prohibits any statement in connection with the

sale of goods "which is untrue or misleading." Cal. Bus. & Prof. Code §17500.

169.    As set forth herein, P&G's claims that the Contaminated Sprays were and are safe

for use by individuals were false because the Contaminated Sprays in fact they contain an unsafe

chemical, Benzene, which could cause a Contaminated Spray user to suffer adverse health effects from use of the Contaminated Sprays, and were likely to deceive the public.

170. P&G's claims that the Contaminated Sprays were and are safe for use by individuals were and are untrue and misleading because they failed to mention the presence of an unsafe chemical, Benzene, which could cause a Contaminated Spray user to suffer adverse health effects from use of the Contaminated Sprays.

171. P&G knew, or reasonably should have known, that all these claims were untrue or misleading.

172. Prospective injunctive relief is necessary given P&G's refusal to offer details as to when they intend to repair the Contaminated Sprays.

173. Plaintiff Velasques, Plaintiff Ortega, and the California Economic Loss Subclass are entitled to injunctive and equitable relief, and restitution in the amount they spent on the Contaminated Sprays and replacement devices.

## TENTH CLAIM FOR RELIEF

**CALIFORNIA'S UNFAIR COMPETITION LAW**
**Cal. Bus. & Prof. Code §§ 17200 *et seq*.**
**On behalf of Plaintiff Velasques, Plaintiff Ortega,**
**and the California Economic Loss Subclass**

174. Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

175. The California Unfair Competition Law prohibits any "unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code §17200.

176. P&G fraudulently represented that the Contaminated Sprays were and are safe for use by individuals when in fact they contain an unsafe chemical, benzene, which could cause a Contaminated Spray user to develop cancer from use of the Contaminated Sprays.

177.     As alleged herein, P&G unlawfully advertised the Contaminated Sprays using false or misleading claims, such that P&G's actions as alleged herein violate at least the following laws:

     A.    The California Legal Remedies Act, Cal. Bus. & Prof. Code § 1750 *et seq.*;

     B.    The California False Advertising Law, Cal. Bus. & Prof. Code §§ 17500, *et seq.*; and

     C.    The Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201, *et seq.*

178.     P&G's conduct with respect to the labeling, packaging, advertising, marketing, and sale of the Contaminated Sprays is unfair because P&G's conduct was immoral, unethical, unscrupulous, or substantially injurious to consumers and the utility of its conduct, if any, does not outweigh the gravity of the harm to its victims.

179.     P&G's conduct with respect to the labeling, packaging, advertising, marketing, and sale of the Contaminated Sprays is also unfair because it violates public policy as declared by specific constitutional, statutory, or regulatory provisions, including, but not limited to, the California Legal Remedies Act, the California False Advertising Law, and the Florida Deceptive and Unfair Trade Practices Act.

180.     P&G's conduct with respect to the labeling, packaging, advertising, marketing, and sale of the Contaminated Sprays is also unfair because the consumer injury is substantial, not outweighed by benefits to consumers or competition, and not one that consumers, themselves, can reasonably avoid.

181.     In accordance with Cal. Bus. & Prof. Code § 17203, Plaintiff Velasques, Plaintiff Ortega, and the California Economic Loss Subclass seek an order requiring P&G to immediately repair or replace the Contaminated Sprays.

182.     Plaintiff Velasques, Plaintiff Ortega, and the California Economic Loss Subclass also seek an order for the restitution of all monies from the sale of the Contaminated Sprays, which were unjustly acquired through acts of fraudulent, unfair, or unlawful competition.

### ELEVENTH CLAIM FOR RELIEF

**FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT**
**Fla. Sta. §§ 501.201, *et seq.***
**On Behalf of Plaintiff Lopez and the Florida Economic Loss Subclass**

183.     Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

184.     The Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. § 501.204. prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce."

185.     FDUTPA further provides anyone aggrieved by a violation of FDUTPA may bring an action to obtain a declaratory judgment that an act or practice violates this part and to enjoin a person who has violated, is violating, or is otherwise likely to violate this part and in any action brought by a person who has suffered a loss as a result of a violation of this part, such person may recover actual damages, plus attorney's fees and court costs.

186.     Plaintiff Lopez, the Classes and Subclasses purchased Contaminated Sprays at issue in this matter for their own use or for that of members of their households.

187.     At all times material hereto, P&G engaged in the advertising, soliciting, providing, offering, or distributing, whether by sale, rental, or otherwise, of goods or services, or any property, whether tangible or intangible, or any other article, commodity, or thing of value, in or from Florida.

188.     The facts that P&G misrepresented, concealed, suppressed or omitted the presence of benzene in the Contaminated Sprays as alleged above were material, in that such

facts are the type of information upon which a reasonable consumer is expected to rely in making a decision of whether to purchase P&G's products.

189.    P&G's misrepresentation, concealment, suppression and omission of material facts as alleged above creates a likelihood of deception and was likely to deceive a consumer acting reasonably in the same circumstances.

190.    P&G engaged in deceptive and unfair acts and practices, misrepresentation, and the concealment, suppression, and omission of material facts as described in the allegations above with the intent that Plaintiff Lopez, the Class, and the Subclasses would rely on those deceptive and unfair acts and practices and induce Plaintiff Lopez, the Class, and the Subclasses to purchase P&G's products.

191.    Because the characteristics of P&G's Contaminated Sprays were not as represented, and those characteristics are material to a reasonable consumer of the type of merchandise, the value of the Contaminated Sprays was less than the value of the Contaminated Sprays would have had the Contaminated Sprays actually possessed the characteristics that were represented.

192.    Plaintiff Lopez, the Class, and the Subclasses purchased P&G's products or services at issue in this action in Florida without knowledge of the material facts that were concealed, suppressed or omitted and without knowledge that P&G's affirmative representations were false.

193.    Plaintiff Lopez, the Class, and the Subclasses were deceived by P&G's deceptive and unfair acts and practices in that had they known the truth they would not have purchased P&G's products or would have paid less for those products.

194.    Instead, as a result of P&G's misrepresentations, Plaintiff Lopez, the Class, and the Subclasses suffered monetary losses in that (1) the actual value of the merchandise they received was less than the value of the merchandise as represented denying them of the benefit of their bargain; and (2) Plaintiff Lopez, the Class, and the Subclasses paid more than the fair market value of the merchandise they received causing them out-of-pocket damages.

195.    Plaintiff Lopez, the Class, and the Subclasses could not have avoided these injuries. Because P&G was the sole source of material information that P&G failed to disclose, Plaintiff Lopez, the Class, and the Subclasses could not have had reason to anticipate the impending harm and thus avoided their injuries.

196.    P&G's misrepresentations and omissions in the sale of the Contaminated Sprays detailed above is unfair because it offends public policy, and is so oppressive that the Florida Economic Loss Subclass has little alternative but to submit and causes consumers substantial injury.

197.    P&G's misrepresentations and omissions in the sale of the Contaminated Sprays is unfair in that it violates the well-established public policies of protecting consumers from avoidable dangers and that the manufacturer of drug products is responsible for ensuring they are fit for human use.

198.    The Florida Economic Loss Subclass has suffered economic injury as a direct and proximate result of the P&G's conduct.

199.    As a direct and proximate result of the foregoing acts and practices, P&G has received, or will receive, income, profits, and other benefits which they would not have received if they had not engaged in the violations described.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, pray for judgment against P&G as to each and every count, including:

A. An order certifying this action as a class action, certifying the Classes and Subclasses requested herein, designating Plaintiffs as the representatives of the Classes and Subclasses, and appointing Plaintiffs' counsel as counsel to the Classes and Subclasses;

B. An order declaring that P&G's actions constitute: (i) breach of express warranty; (ii) breach of the implied warranty of merchantability; (iii) fraudulent misrepresentation; (iv) fraud by omission; and (v) negligent failure to warn; (vi) unjust enrichment; and (vii) unfair and deceptive business practices in violation of California and Florida consumer protection statutes, and that P&G is liable to Plaintiffs, members of the Class, and members of the Subclasses, as described herein, for damages arising therefrom;

C. An order awarding declaratory relief, and any further retrospective or prospective injunctive relief permitted by law or equity, including enjoining P&G from continuing the unlawful practices alleged herein, and injunctive relief to remedy P&G's past conduct;

D. A judgment awarding Plaintiffs and members of the Classes and Subclasses all appropriate damages, in an amount to be determined at trial;

E. A judgment awarding equitable, injunctive, and/or declaratory relief as may be appropriate including, but not limited to, restitution, disgorgement, and requiring P&G to develop, implement, and maintain a medical monitoring program as detailed above for members of the Classes and Subclasses.

F.  A judgment awarding Plaintiffs and members of the Classes and Subclasses prejudgment and post-judgment interest, as permitted by law;

G.  A judgment awarding Plaintiffs and members of the Classes and Subclasses costs and fees, including attorneys' fees, as permitted by law; and

H.  Grant such other legal, equitable or further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury for all issues so triable.

DATED:          November 19, 2021          Respectfully submitted,

/s/ Joshua R. Cohen
Joshua R. Cohen (0032368)
jcohen@crklaw.com
COHEN ROSENTHAL & KRAMER LLP
3208 Clinton Avenue
One Clinton Place
Cleveland, Ohio 44113
Tel. & Fax 216.815.9500


/s/ Steven L. Bloch
Steven L. Bloch (*pro hac vice* forthcoming)
Ian W. Sloss (*pro hac vice* forthcoming)
**SILVER GOLUB & TEITELL LLP**
184 Atlantic Street
Stamford, Connecticut 06901
Telephone: (203) 325-4491
Facsimile: (203) 325-3769
sbloch@sgtlaw.com
isloss@sgtlaw.com